## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

BRIAN JOHNSON,

             Plaintiff,            **MEMORANDUM OF LAW & ORDER**

v.                                Civ. No. 12-806 (MJD/JJG)

MINNEAPOLIS PARK AND
RECREATION BOARD,

             Defendant.

Jonathan Scruggs and Nathan W. Kellum, Alliance Defense Fund, and Stanley N. Zahorsky, Zahorsky Law Firm, Counsel for Plaintiff Brian Johnson.

Ann E. Walther, Brian F. Rice, and Michael J. Salchert, Rice, Michels & Walther, LLP, Counsel for Defendant Minneapolis Park and Recreation Board.

## I.    Introduction & Summary of Decision

This matter is before the Court on Plaintiff Brian Johnson's Motion for a Preliminary Injunction.  [Docket No. 5.]  The Court heard oral argument on May 25, 2012.

This case involves a regulation of the distribution of materials at the Twin Cities Pride Festival—an annual celebration organized by Twin Cities Pride, a private organization, and held in Loring Park, a public park managed by

Defendant Minneapolis Park and Recreation Board ("MPRB").  This year's

Festival is scheduled for June 23 and 24, 2012.  Regulations currently in place

require that all individuals and groups that wish to distribute materials in Loring

Park during the Festival must do so from a booth.  Booths are available from

both Twin Cities Pride and from MPRB.

Twin Cities Pride limits access to its booths to individuals and

organizations which support its mission and beliefs in inclusion and equal rights

for Minnesota's lesbian, gay, bisexual, and transgender community.  MPRB

booths are open to all regardless of viewpoint.  The MPRB booths are placed in

an "MPRB Area" which is in a well-traveled location adjacent to the designated

Festival area.  There are no physical barriers between the two areas.  Thus, any

individual or group that wishes to distribute materials to Festival attendees in

Loring Park is able to do so from an MPRB booth.

MPRB and Twin Cities Pride also provide a "drop zone"—a booth within

the Festival where individuals may drop materials to be picked up by interested

passersby.  During the Festival, distribution of all materials inside Loring Park

but outside of booths or the drop zone is not permitted.  MPRB contends that this

regulation allows for safe and efficient crowd management during the Festival.

Plaintiff has requested that this Court issue a preliminary injunction, lifting the material distribution regulation and allowing him to hand-distribute Bibles inside Loring Park and outside of a booth during the Festival.  He argues that the material distribution regulation violates his First Amendment right to free speech.

The right to free expression in a public forum is a core liberty which must be guarded with vigilance.  But the right to speak is not absolute; it must sometimes be balanced with the rights and interests of others, as well as legitimate governmental concerns.  Courts therefore recognize that, when the government seeks to regulate the time, place, or manner of speech in a public forum and does so in a content neutral manner, its actions are constitutional so long as they are narrowly tailored to serve a significant interest and allow ample alternative channels of communication.

Given the significant government interests involved in this case, the very limited and narrow nature of the regulation at issue, and the fact that Plaintiff and other likeminded individuals are left free to express their beliefs and reach their desired audience in a multitude of ways, the Court concludes that Plaintiff is unlikely to succeed in his constitutional challenge.  Plaintiff is treated no

differently than other exhibitors who wish to reach an audience in Loring Park

during the Festival.  While Twin Cities Pride has exercised its own First

Amendment right not to validate his views, Plaintiff remains free to distribute

Bibles from a booth within the park.  The Court therefore declines to issue the

preliminary injunction which he seeks.

## II.    Background

### A.    1995-2009

Plaintiff Brian Johnson is an evangelical Christian who seeks to spread his

religious beliefs by telling people about Jesus and distributing free Bibles.

Defendant Minneapolis Park and Recreation Board ("MPRB") owns and operates

parkland within the City of Minneapolis, including Loring Park—a 42 acre park

on the southwest corner of downtown Minneapolis.  Loring Park is the site of an

annual festival hosted by Twin Cities Pride, a nonprofit organization dedicated

to "[c]reat[ing] experiences that bring the greater GLBT community together to

commemorate our diverse heritage, foster[ing] inclusion, educat[ing] and

creat[ing] awareness of issues, and celebrat[ing] achievements in equality."

(Belstler Decl. [Docket No. 27] ¶ 2.)  The Twin Cities Pride Festival ("Festival"),

which is free and open to the public, has been held in Loring Park for 34 of the

past 39 years.  The Festival, traditionally held in late June, hosts concerts and

other entertainment and features booths occupied by sponsors, exhibitors, and venders which line the walkways in Loring Park.  Twin Cities Pride expects that over 250,000 people—a number equivalent to two-thirds the population of the City of Minneapolis—will attend the Festival this year.

Plaintiff has sought to distribute Bibles at the Festival for over 15 years. From 1998 until 2008, Plaintiff rented a booth from which he handed out Bibles to willing Festival attendees.  In 2009, after an exchange of emails between Plaintiff and Twin Cities Pride, Plaintiff's application for a booth at the Festival was denied.  Plaintiff and his family attended the 2009 Festival with the intent to distribute Bibles.  He was prevented from doing so by members of the Minneapolis Police Department.  When he refused to leave, Plaintiff was arrested for trespass, but the charge was later dropped.

### B.    Legal Proceedings, 2010-2011

In anticipation of the 2010 Festival, Plaintiff—through one of his attorneys—sent MPRB a demand letter in which he requested to be permitted to "enter into Loring Park and onto the perimeter sidewalks around the Park to distribute literature, display signs, and speak during the time of the festival." (Pl. Exs. to Mot. for Preliminary Injunction ("Pl.'s Ex.") [Docket No. 8], Ex. D.)

MPRB responded to Plaintiff's letter on April 26, 2010, assuring Plaintiff that it would not prevent him from engaging in such activities.  (Id., Ex. E.)

Shortly before the 2010 Festival, Twin Cities Pride brought suit in this Court, seeking a temporary restraining order requiring MPRB to "prohibit[] any person or organization from distributing written materials or tangible objects outside of an authorized exhibitor or vendor booth" and to "prohibit all signage not authorized by Twin Cities Pride."  See Gay-Lesbian-Bisexual-Transgender Pride/Twin Cities v. Minneapolis Park and Recreation Bd., 721 F. Supp. 2d 866, 870 (D. Minn. 2010) (Tunheim, J.) (hereinafter, "Pride I").  Acknowledging that the case involved a balancing of the First Amendment interests of both Twin Cities Pride and Plaintiff, the Court permitted Plaintiff to intervene.  See id. at 869 n.1.

First addressing Twin Cities Pride's First Amendment interests, the Court reasoned that the group had no duty to include as participants in the Festival individuals or groups which did not share its mission or beliefs.  Id. at 871-72. The Court therefore concluded that Twin Cities Pride was entitled to deny Plaintiff's application for a booth.  Nonetheless, the Court reasoned that Twin Cities Pride's power to exclude Plaintiff as a participant did not give Twin Cities

Pride carte blanche power to prevent Plaintiff from expressing his views as a

<u>member of the public</u> during the Festival.[1]  Applying the traditional test for a

content neutral time, place, or manner regulation in a public forum, the Court

concluded that restrictions sought by Twin Cities Pride—preventing Plaintiff

from "distributing literature, wearing signage conveying his message, and taking

surveys on the Pride Festival grounds"—were not narrowly tailored to serve a

significant government interest.  <u>Id.</u> at 873.

Although the Court denied Twin Cities Pride's request for a preliminary

injunction, it noted that its "conclusion does not foreclose MPRB's involvement

in restricting the exercise of First Amendment rights that may be disruptive or

pose a threat to crowd safety."  <u>Id.</u> at 874.  The Court also raised the possibility

that MPRB could create "free speech zones . . . in which anyone who wishes to

distribute literature or display signage may do so," so long as those zones

"provide[d] attendees with ample alternative channels of expression."  <u>Id.</u> at 875

n.2.

---

[1] Throughout this Order, the word "participant" is used to refer to those who have been officially approved by Twin Cities Pride to participate in the Festival as vendors, exhibitors, or entertainers.  Festival "participants" can be contrasted with members of the public who are free to attend the Festival but have no special status conferred by Twin Cities Pride.

Twin Cities Pride's motion for a preliminary injunction having been denied, Plaintiff attended the 2010 Festival and proceeded to distribute Bibles.  In anticipation of the 2011 Festival, litigation proceeded.  Plaintiff filed a motion for summary judgment.  In April 2011, the Court dismissed Plaintiff from the case, noting that Twin Cities Pride's complaint had been amended to remove any mention of Plaintiff and to seek broader relief.  <u>Gay-Lesbian-Bisexual-Transgender Pride/Twin Cities v. Minneapolis Park and Recreation Bd.</u>, Civ. No. 10-2579 (JRT/JJG), 2011 WL 1300381 at *2-*4 (D. Minn. April 4, 2011). The Court concluded that while Plaintiff may have retained some interest in the litigation, his interests would be adequately protected by MPRB.  <u>Id.</u>  The Court also denied Plaintiff's motion for summary judgment as moot.  <u>Id.</u>

Shortly before the 2011 Festival, Twin Cities Pride and MPRB reached a settlement agreement.  Their agreement stipulated that MPRB would designate and manage an area within Loring Park but not within the Festival's designated boundaries, where booth-seekers excluded from the Festival could rent booths from MPRB and distribute literature (the "MPRB Area").  The agreement also established a material "drop zone" within the Festival area where "anyone may place noncommercial literature" for consumption by Festival goers.  Twin Cities

Pride and MPRB further agreed to limit "all distribution of materials in Loring Park during the Pride Festival, except from a Pride-sponsored booth or the material drop area designated by Twin Cities Pride within the permitted area, or from a Park Board-sponsored booth within the nonpermitted area."  In short, all materials must be distributed from a booth or via the drop zone.  Members of the public who wish to distribute literature and do not qualify for a Festival booth may do so by using the drop zone or by handing out literature from a booth in the MPRB Area.  Having reached a settlement, the parties stipulated to dismissal of the case, which the Court then granted.  Plaintiff states that the agreement between Twin Cities Pride and MPRB was unacceptable to him.  Plaintiff states that he did not distribute Bibles during the 2011 Festival because he feared arrest, but he does not allege that he was prevented from obtaining an MPRB booth from which he could have distributed Bibles to Festival attendees.

### C.    The 2012 Festival and Current Legal Proceedings

The 2012 Festival is scheduled to be held on June 23 and 24, 2012.  Twin Cities Pride and MPRB plan to follow the terms set out in their 2011 settlement agreement.  A map related to the 2012 Festival sets out an MPRB Area in Loring Park for exhibitors unable to secure booths within the Festival, along with a drop zone for literature distribution within the Festival.  The MPRB Area is a

triangular space in the southwest corner of Loring Park near the corner of

Lyndale Avenue and Oak Grove Street, the location of a bus stop and one of the

park's main entrances.  On two sides the MPRB Area is bounded by, adjacent to,

and contiguous with the Festival's "Purple Zone," which includes a dining area,

a food court, an entertainment stage, and roughly 100 booths for Festival

participants.  The third side runs along a public street.  There are no physical

barriers separating the MPRB Area and the Festival area.  The only practical

difference between the areas is that one is labeled "Festival" and the other is

labeled "MPRB Area."

The drop zone is located in a central location within the Festival and along

a walkway, roughly equidistant between a sports field, a school zone, and an

entertainment stage.  The material distribution regulation remains; personal

distribution of any materials outside of a booth is not permitted.  MPRB and

Twin Cities Pride do not seek to limit other non-disruptive expressive activity

within Loring Park.  Members of the public are free to walk throughout the park

with signs and to convey their messages to willing listeners.

Plaintiff has brought this action against MPRB, arguing that the material

distribution regulation violates his right to free speech under the First

Amendment.  In the instant motion, Plaintiff seeks a preliminary injunction

allowing him to distribute Bibles freely within the interior boundaries of Loring

Park which, during the Festival, consists mainly of walkways lined with booths,

food concession stands, and stages.

## III.    Discussion

In response to Plaintiff's motion for a preliminary injunction, MPRB argues

that Plaintiff has waived his right to challenge the Festival literature restrictions.

MPRB also argues that Plaintiff's motion for a preliminary injunction cannot

succeed because Plaintiff cannot show a likelihood of success on the merits of his

First Amendment claims.

### A.    Waiver & Res Judicata

When Plaintiff was dismissed as an intervenor in Pride I, he filed a notice

of appeal challenging the District Court's order.  After Twin Cities Pride and

MPRB reached a settlement in that case, Plaintiff moved for voluntary dismissal

of the appeal, noting that the Court's order and final judgment had rendered his

appeal "possibly moot."  MPRB now argues that, by failing to proceed with his

appeal, Plaintiff waived his right to bring the instant action.

In support of its waiver argument, MPRB notes opinions suggesting that

intervenors are entitled to appeal a judgment even where the other parties have

reached a settlement or otherwise resolved their dispute.  In <u>Porter v. Knickrehm</u>, 457 F.3d 794, 799-800 (8th Cir. 2006), for example, the Eighth Circuit explained that an intervenor "can maintain a lawsuit after resolution by the original parties in only very narrow circumstances," that is, where "they have a separate basis for jurisdiction against the defendants."  The Eighth Circuit has likewise held that an intervenor may maintain an appeal "without the party on whose side the intervention was permitted" so long as the "the intervenor has Article III standing."  <u>Mausolf v. Babbitt</u>, 125 F.3d 661, 666 (8th Cir. 1997) (citation omitted).  Although MPRB does not cite any case law for the proposition, it seems to contend Plaintiff had a duty to pursue intervention in <u>Pride I</u>, and Plaintiff's failure to satisfy that duty should act to prevent him from pressing his current claims.

As Plaintiff notes, case law on the duties of intervenors points to the opposite conclusion.  The Eighth Circuit has held, for example, that a party which elects <u>not</u> to appeal a denial of its request to intervene is not precluded from raising claims in a separate action.  <u>Enter. Bank v. Magna Bank of Mo.</u>, 92 F.3d 743, 746 (8th Cir. 1996).  Such a party is barred only from "later relitigating

whether it was an indispensable party."  Id. at 746-47 (citing Cheyenne River

Sioux Tribe of Indians v. United States, 338 F.2d 906 (8th Cir. 1964)).

　　　Plaintiff further notes that a party is not barred from bringing a claim

simply because the party could have permissibly intervened in a previous action,

see Regions Bank v. J.R. Oil Co., 387 F.3d 721, 731 (8th Cir. 2004), and that a

settlement agreement between two parties does not "have res judicata effects on

a nonparty."  See, e.g., United States v. Tex. E. Transmission Corp., 923 F.2d 410,

413-14 (5th Cir. 1991).  Plaintiff finally argues that applying res judicata here

would violate his due process rights, since he was no longer a party in Pride I at

the time that the Court issued final judgment.  See Parklane Hosiery Co. v. Shore,

439 U.S. 322, 327 n.7 (1979) ("It is a violation of due process for a judgment to be

binding on a litigant who was not a party or a privy and therefore has never had

an opportunity to be heard.").

　　　The facts of this case are unique:  Plaintiff was granted intervenor status

but that status was later revoked when he moved for summary judgment.  While

MPRB may well be correct that Plaintiff might have maintained his appeal in

Pride I in spite of the other parties' settlement and the Court's dismissal of the

case, MPRB does not identify any case indicating that his failure to maintain his

appeal should act to bar Plaintiff from bringing his current claim.  Particularly in light of the fact that this Court dismissed Plaintiff as an intervenor before MPRB and Twin Cities Pride agreed on a settlement and before the Court entered judgment in Pride I, the Court cannot conclude that Plaintiff has already had a full or fair opportunity to be heard.  For these reasons, the Court will allow Plaintiff to maintain his claims in the instant action.

### B.    Preliminary Injunction

#### 1. Standard

The Eighth Circuit Court of Appeals has established the standard for considering preliminary injunctions.  Dataphase Sys. Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  This Court must consider (1) the threat of irreparable harm to the moving party if an injunction is not granted, (2) the harm suffered by the moving party if injunctive relief is denied as compared to the effect on the non-moving party if the relief is granted, (3) the public interest, and (4) the probability that the moving party will succeed on the merits.  Id.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976) (Brennan, J.) (plurality opinion).  Therefore, if Plaintiff can establish a likelihood of success on the merits, Plaintiff's burden to show irreparable harm

14

will also be satisfied. <u>See, e.g.</u>, <u>Phelps-Roper v. Nixon</u>, 545 F.3d 685, 690 (8th Cir.

2008). "Likewise, the determination of where the public interest lies also is

dependent on the determination of the likelihood of success on the merits of the

First Amendment challenge because it is always in the public interest to protect

constitutional rights." <u>Id.</u> Moreover, "[t]he balance of equities, too, generally

favors the constitutionally-protected freedom of expression." <u>Id.</u> For these

reasons, in the First Amendment context, "the likelihood of success on the merits

is often the determining factor in whether a preliminary injunction should issue."

<u>Id.</u>

### 2. Plaintiff's Likelihood of Success on the Merits

Two independent but related issues are raised in this case: First is the

scope of Twin Cities Pride's power to exclude Plaintiff as a <u>participant</u>—whether

Twin Cities Pride violates Plaintiff's First Amendment rights when it denies him

a booth within the Festival. That question was resolved in favor of Twin Cities

Pride in <u>Pride I</u>. The second issue is whether Twin Cities Pride and MPRB may

restrict the expressive activity of <u>members of the public</u> by limiting the

distribution of literature within Loring Park to Festival and MPRB-Area booths

and the drop zone. This second issue requires application of the familiar three-

step analysis of speech regulations on government owned property.  To avoid

conflating the two issues, the Court discusses them separately below.

### 3.  Likelihood of Success:  Denial of Festival Booth

Twin Cities Pride refuses to allow Plaintiff to obtain a Festival booth as he

had done in years prior to 2009.  Although Plaintiff does not directly allege that

this refusal is a violation of his First Amendment rights, he weaves the denial of

a Festival booth throughout his arguments concerning the material distribution

regulation.  For that reason, the Court briefly addresses the issue here.

Twin Cities Pride's First Amendment right to control the expressive

content of the Festival was addressed by the Court in Pride I.  The Court there

concluded, and the parties appear to have agreed, that Twin Cities Pride was

entitled to exclude exhibitors who did not share its goals or beliefs.  See Pride I,

721 F. Supp. 2d at 872.  The Court relied on the Supreme Court's opinion in

Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S.

557 (1995).  In Hurley, a group of gay, lesbian, and bisexual descendants of Irish

immigrants ("GLIB") sought to march in an annual St. Patrick's Day-Evacuation

Day Parade organized by a private group and held on public streets in Boston,

Massachusetts.  Id. at 561.  GLIB won a state court order allowing them to do so.

Id.  Reversing the judgment of the Massachusetts Supreme Court, the United

16

States Supreme Court concluded that the government could not compel a private organization to change the content of its expressive activity by requiring it to admit participants seeking to express contrary views, even where a state public accommodation law seemed to require their inclusion.  See id. 573-77.

In light of Hurley, it is plain enough that Twin Cities Pride is entitled to create a Festival in which each participant "contribute[s] something to a common theme" and, therefore, may pick and choose Festival participants who share in its mission and beliefs.  Id. at 576.  Plaintiff cannot succeed on a claim that Twin Cities Pride must include him in the Festival by granting him a booth.

The Court notes that the denial of a Festival booth in this case does not mean that Plaintiff is unable to obtain a booth in Loring Park during the Festival. Plaintiff and other exhibitors unable to secure a Festival booth because of their viewpoint may obtain a booth within the MPRB Area, a well-travelled part of the park adjacent to and contiguous with the designated Festival area.

### 4.  Likelihood of Success:  Material Distribution Regulation

The second and more difficult issue raised in this case is whether the material distribution regulation unduly restricts Plaintiff's First Amendment speech rights.  That regulation limits a particular manner of speech (distribution of materials) at a particular time (during the Festival) and from a particular

location (areas within Loring Park apart from the drop zone or booths in the Festival or the MPRB Area).

The Court must apply the familiar three step analysis for speech regulations on government owned property.  See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985).  First the Court must determine whether Plaintiff's conduct is protected speech under the First Amendment. Second the Court must "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic."  Id.  Finally, the Court must "appl[y] the appropriate standard of scrutiny to decide whether [the proposed] restriction on speech passes constitutional muster."  Bowman v. White, 444 F.3d 967, 974 (8th Cir. 2006).

The first two steps of this analysis are undisputed in this case.  The parties agree that the conduct which is being restricted—conveying a religious message by distributing Bibles—is protected First Amendment speech.  It would be hard to argue otherwise:  "The hand distribution of religious tracts is an age-old form of missionary evangelism" which "occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits." Murdock v. Pennsylvania, 319 U.S. 105, 108-09 (1943).  While Plaintiff further and

correctly notes that his right to "wear a message promoting free Bibles on a t-shirt" and "engage in one-on-one conversations about his faith" are also protected forms of expression, those activities are not affected by the challenged regulation.

The parties further agree that Loring Park is a traditional public forum and that it remains so during the Festival.  Public parks are quintessential public fora, and they retain that status where, as here, "a private actor assumes non-exclusive control of an area to hold an event to which the public has free and open access." Jankowski v. City of Duluth, Civ. No. 11-3392 (MJD/LIB), 2011 WL 7656906, at *7-*8 (D. Minn. Dec. 20, 2011); accord Pride I, 721 F. Supp. 2d at 873; see Startzell v. City of Philadelphia, 533 F.3d at 197 (3d Cir. 2008); Dietrich v. John Ascuaga's Nugget, 548 F.3d 892, 899 (9th Cir. 2008); Parks v. City of Columbus, 395 F.3d 643, 653 (6th Cir. 2005).

The third step in the analysis—application of the appropriate constitutional standard—is the source of the conflict in this case.  "A content-based restriction on speech within a traditional public forum" is subject to strict scrutiny; it "must be necessary to serve a compelling government interest and be narrowly drawn to achieve that interest." Bowman, 444 F.3d at 975.  A speech

regulation that is "that is not content-based and that restricts the time, place or

manner in which speech may be communicated is subjected to a different, less

restrictive standard" known as intermediate scrutiny.  Id.  Such a regulation

must be "narrowly tailored to serve a significant government interest and leave[]

open ample alternative channels of communication." Id.

Plaintiff argues that the material distribution regulation is a content-based

speech restriction and should therefore be subject to strict scrutiny.  He further

contends that MPRB has not presented a legitimate interest which is advanced by

the regulation and that the regulation is not narrowly tailored.  MPRB responds

that the material distribution regulation is content neutral and therefore subject

to intermediate scrutiny.  MPRB further argues that the regulation, coupled with

the provision of the drop zone and MPRB-Area booths, is narrowly tailored to

serve a significant government interest.

### a.  Content Neutrality

A regulation is not content-based "simply because its enactment was

motivated by the conduct of the partisans on one side of a debate." Hill v.

Colorado, 530 U.S. 703, 724 (2000).  In determining whether a regulation of

protected speech is content neutral, "[t]he plain meaning of the text controls, and

the . . . specific motivation for passing a law is not relevant, so long as the

provision is neutral on its face." <u>Nixon</u>, 545 F.3d at 691.

The regulation in this case states, in relevant part:

> Sales, sampling, or distribution of any material within Loring Park
> outside of an authorized MPRB booth or an authorized Twin Cities
> Pride [booth] is not permitted.

(MPRB 2011 Rules for Exhibitor/Vendor Booth at Loring Park June 25 and 26,

Pl.'s Ex. I at 2.)

On its face, regulation of the distribution "any material" is clearly content

neutral and does not give MPRB discretion to target materials based on their

content. As the Sixth Circuit has noted, "[r]equiring that all literature be

distributed from a stationary location is a content-neutral regulation." <u>Saieg v.

City of Dearborn</u>, 641 F.3d 737, 735 (6th Cir. 2011). Plaintiff nonetheless argues

that the restriction is content-based because he cannot rent a Festival booth.

MPRB responds that Twin Cities Pride's right to pick and choose participants in

the Festival does not change the content-neutral character of the material

distribution limitation which applies to members of the public. Moreover, MPRB

notes that Plaintiff is free to obtain an MPRB booth within Loring Park from

which he would be permitted to distribute materials to Festival attendees without restriction.

For the proposition that the material distribution regulation is content-based, Plaintiff cites dicta from a footnote in a Sixth Circuit case, <u>Bays v. City of Fairborn</u>, 668 F.3d 814, 822 n.3 (6th Cir. 2012).  In <u>Bays</u>, the Court addressed a ban on all "sales or soliciting of causes outside of . . . booth space[s]" at an annual sweet corn festival held in a public park.  <u>Id.</u> at 817-18.  The plaintiffs, who did not apply for a booth, were prevented from displaying religious signs and handing out literature.  <u>Id.</u>  The Court concluded that the regulation was content neutral but ultimately determined that it was overbroad—restricting even "one-on-one conversations"—and thus was not narrowly tailored to serve the government's purported interests.  <u>Id.</u> at 822-23.  In the footnote cited by Plaintiff, the Court indicated that a rule "reserv[ing] discretion in the festival organizers to deny permits on the basis of content" might be unconstitutional.  <u>Id.</u> at 822 n.3.  In support, the Court cited <u>Shuttlesworth v. City of Birmingham</u>, 394 U.S. 147, 150 (1969), a case which struck down a city ordinance that "conferred upon the City Commission virtually unbridled and absolute power to

prohibit any 'parade,' 'procession,' or 'demonstration' on the city's streets or public ways."

This case bears little resemblance to <u>Bays</u> and even less to <u>Shuttlesworth</u>. While Twin Cities Pride is unwilling to grant Plaintiff a booth, Plaintiff is free to obtain a booth in Loring Park and during the Festival from MPRB.  This case does not involve an exercise of "unbridled and absolute power."  <u>See</u> <u>id.</u> at 150. As discussed above, the case most applicable to Twin Cities Pride's decision to limit Festival participants to those who support its mission is <u>Hurley</u>, in which the Supreme Court upheld a parade organizer's right to pick and choose participants who supported the parade's "common theme."  515 U.S. at 576. Twin Cities Pride's exercise of the right explained in <u>Hurley</u> does not bear on the content neutrality of the material distribution regulation.  To the extent that the footnote in <u>Bays</u> indicates that a private entity holding a festival in a public park may not constitutionally exclude <u>participants</u>, such an assertion would be directly contrary to the Supreme Court's opinion in <u>Hurley</u>.

The material distribution regulation is content-neutral on its face and Plaintiff has not presented a convincing argument that Twin Cities Pride's decision to exclude Plaintiff as a Festival participant bears on the regulation's

neutrality.  Because the regulation is content-neutral, intermediate scrutiny

applies.

### b.  Application of Intermediate Scrutiny

A content-neutral regulation of the time, place, or manner of speech in a

traditional public forum must be narrowly tailored to serve a significant

government interest.  See, e.g., Bowman, 444 F.3d at 975.

Plaintiff argues that MPRB has not shown the requisite significant

government interest and that the regulation is both over-inclusive and under-

inclusive; that is, he argues that the regulation bars more speech than is

necessary to protect the government's purported interests and also fails to

restrict other speech which would equally interfere with those interests.  Over-

inclusiveness calls into question narrowness of the regulation's tailoring, while

under-inclusiveness "may diminish the credibility of the government's rationale

for restricting speech."  City of Ladue v. Gilleo, 512 U.S. 43, 52 (1994).

### i.  Significant Government Interest

"As a general matter it is clear that a State's interest in protecting the

'safety and convenience' of persons using a public forum is a valid governmental

objective."  Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640,

650 (1981).  In showing that its interests are in need of protection, the government

must show that the "the recited harms are real, not merely conjectural, and that

the regulation will in fact alleviate these harms in a direct and material way."

Turner Broadcasting Sys., Inc. v. F.C.C., 512 U.S. 622, 664 (1994).

MPRB states that the purpose of the material distribution regulation is to

protect public safety by "maintaining the orderly flow of people, providing

access for security and emergency vehicles, and facilitating the activities of the

participants at the [Festival]."  (MPRB Mem. [Docket No. 24] at 15.)

Plaintiff challenges the validity of the public safety and crowd control

interests advanced by MPRB, arguing that MPRB has not shown that distribution

of literature outside of booths and throughout Loring Park would cause

significant crowd control and public safety concerns.  In support of its position,

MPRB has submitted a declaration from the Executive Director of Twin Cities

Pride, Dorothy Belstler.  Belstler avers that, "[i]n past festivals, distribution of

literature from outside a booth has caused traffic congestion, security problems,

complaints from participants, and has disrupted the message of participants who

pay to have a booth" and that "[e]very year, Twin Cities Pride's management

and security receives complaints about the traffic congestion caused by non-

participants handing out literature and materials from outside a booth." (Belstler

Decl. ¶ 17.)

As an example, Belstler has described crowd congestion and disruption

caused at the 2010 Festival by animal rights activists who distributed leaflets

outside of booths. (Id.) Those activists "handed out pamphlets and flyers with

graphic images of cruelty to animals from outside a booth," prompting "Twin

Cities Pride's management and security [to receive] many complaints from

participants because of the traffic congestion caused by these non-participants

handing out literature from outside of a booth" while "the participants

themselves were required to remain in their booths when handing out literature

or materials." (Id.) Belstler notes that, the next year, the activists utilized the

material drop zone and, as a result, there were no complaints. (Id.)

MPRB has also submitted evidence to show the scale of the crowds present

in Loring Park during the Festival. In line with observed attendance in previous

years, Twin Cities Pride expects over 250,000 Festival attendees during the two

day event this year. This expected attendance level, along with Loring Park's 42

acre footprint, leads to a projected crowd density of nearly 3,000 people per acre.

MPRB notes that this crowd density is nearly three times the crowd density at

the Minnesota State Fair.  This comparison is important because the Supreme

Court has held that a ban on literature distribution outside of booths at the

Minnesota State Fair "satisf[ied] the requirement that a place or manner

restriction must serve a substantial state interest" in light of the crowd control

issues presented.  Heffron, 452 U.S. at 654.  More recently, other courts applying

intermediate scrutiny to speech regulations in traditional public fora have

concluded that government "interests in pedestrian and traffic safety, as well as

in preventing traffic congestion, are significant."  See, e.g., Kuba v. 1-A Agric.

Ass'n, 387 F.3d 850, 858 (9th Cir. 2004) and cases cited.  The Court agrees that

MPRB's interest in crowd control and safety is a significant government interest.

　　　Another issue that the Court has to address is whether MPRB has

sufficiently shown "that the proposed communicative activity"—literature

distribution—"endangers" its significant interest in crowd control.  See id. at 859.

Writing separately in Heffron, Justice Blackmun downplayed the disruptive

nature of such activity, noting that "[t]he distribution of literature does not

require that the recipient stop in order to receive the message the speaker wishes

to convey; instead the recipient is free to read the message at a later time."  452

U.S. at 665 (Blackmun, J., concurring in part and dissenting in part).  This

language has been quoted with some approval in subsequent opinions.  See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 690 (1992) (O'Connor, J., concurring); United States v. Kokinda, 497 U.S. 720, 734 (1990) (plurality opinion).  Focusing only on Plaintiff's proposed activity—a handful of individuals handing out Bibles—it would be difficult to assert that MPRB's interest is endangered.  But the Court's inquiry "must involve not only [the plaintiff], but also all other organizations that would be entitled to distribute" materials outside of booths if the rule were not enforced.  Heffron, 452 U.S. 654 (emphasis added).  The particularized approach advocated by Plaintiff—and followed by the Minnesota Supreme Court in Heffron—was rejected by the United States Supreme Court.  Id. at 652.  Therefore this issue is not complex, and it is easy for the Court to follow the precedent set in Heffron.

Hundreds of organizations rent booths at the Festival in order to reach the crowds that gather there, and most of them distribute free literature.  (Belstler Decl. ¶ 6.)  It stands to reason that many individuals and groups would enjoy and take advantage of an opportunity to perambulate through the crowd, freely distributing literature to the quarter million Festival attendees.  Indeed, the limited evidence developed at this stage in the litigation indicates that other

individuals and groups have, in fact, attempted to distribute literature to the Festival crowd outside of booths, causing disruptions.  (Belstler Decl. ¶ 17.) While Plaintiff urges the Court not to focus on the actions of a few disruptive "bad apples," even the best behaved of leafleteers, can, in the aggregate, cause significant crowd congestion.  As in Heffron, it is not difficult to imagine the "widespread disorder" that would arise if hundreds of exhibitors were permitted to leave their booths and distribute their materials on the walkways and amongst the crowds gathered in Loring Park.  See Heffron, 452 U.S. at 653.

The evidence at this early stage is sufficient to show that, in the absence of the regulation, additional individuals and groups will likely seek to distribute materials to the crowds gathered throughout the Festival, as they have in the past, causing significant crowd control and public safety concerns.  For the foregoing reasons, the Court concludes that MPRB is likely to succeed in its assertions that unfettered literature distribution in Loring Park during the Festival would threaten its significant interest in crowd control and safety.

### ii.  Under-Inclusiveness

A regulation which is under-inclusive by exempting certain types of speech "may diminish the credibility of the government's rationale for restricting speech in the first place."  City of Ladue, 512 U.S. at 52.  Not all under-

29

inclusiveness triggers such skepticism, however:  "[A] limitation on speech that

is not all-encompassing may still be narrowly tailored where the

underinclusivity does not favor a particular viewpoint or undermine the

rationale given for the regulation."  Bowman, 444 F.3d at 983.

Plaintiff argues that the "wide variety of expressive and non-expressive

activities" which are permitted during the Festival "generate more congestion

and safety concerns than literature distribution" and therefore undermine the

legitimacy of MPRB's purported interest.  In support Plaintiff notes the following

unregulated activities: "standing around conversing, talking on cell phones,

standing around eating, waiting in line at booths, passing out literature from

booths, walking around with dogs, sitting on chairs in the grass, playing

volleyball, . . . walking through the event while pushing bikes and baby

strollers," and "engag[ing] in performances in Loring Park."  (Pl.'s Mem. [Docket

No. 6] at 18.)  Plaintiff argues that these "exceptions" indicate that the material

distribution regulation is a "sham."  (Id. at 19.)

Most of the activities listed by Plaintiff are entirely unavoidable in a public

park context and are essential to making the Festival festive.  A ban on "talking

on cells phones, standing around eating, waiting in line at booths, passing out

literature from booths, walking around with dogs, sitting on chairs in the grass,

and . . . walking through the event while pushing bikes and baby strollers"

would prevent numerous members of the public from attending or enjoying the

Festival.  The fact that the government "allows" these commonplace and

essential activities does not raise a "red flag" or cast doubt on the credibility of

MPRB's legitimate interest in crowd control.  See Bowman, 444 F.3d at 983.

Moreover, some of the activities highlighted by Plaintiff—distribution of

literature from booths set off from the park's walkways and the presumably

orderly line-waiting which results—actually help reduce crowd congestion and

address public safety concerns.

An obvious objective of a public Festival is to draw a crowd.  The mere fact

that events at the Festival create congestion should not render MPRB unable to

control the crowd or prevent other activities which might cause even more

congestion.  Instead, the fact that a crowd is drawn to the festival provides the

basis for the government's authority to enact content neutral regulations to curb

excessive congestion where possible.

Other activities identified by Plaintiff—namely volleyball and sidewalk

performances—may warrant further attention.  If spontaneous games of

volleyball were indeed permitted along the public walkways and among the

Festival crowds, the Court presumes that such activity would be more congestive

than literature distribution.  Such an odd exception would call into question the

credibility of MPRB's purported interest in crowd control and public safety.  It

appears, however, that the volleyball at issue is played on a designated

volleyball court.  The Court presumes that the volleyball games played on

volleyball courts are as much a part of the Festival as the concerts held on the

stages throughout the park.  It is therefore a stretch to say that allowing

volleyball to be played on a volleyball court undermines the legitimacy of

MPRB's interest in crowd control throughout the Festival.  There seems little

doubt that Plaintiff has no legitimate interest or right to spread his views at the

net between volleys, and Plaintiff makes no argument to the contrary.

The final issue of "street performers" on the walkways throughout Loring

Park raises perhaps the closest question on under-inclusiveness.  Plaintiff has

submitted photographs of a performer posing on a public walkway during a

previous Festival.  (Pl.'s Ex. K.)  The performer in the photographs seems to be

the type who strikes a pose and then "freezes" like a statue.  Unlike Festival

booth exhibitors and venders (who are situated off of public walkways to

prevent congestion) or the volleyball games (which appear to be played on

designated volleyball courts), the performers seem to occupy the same open

spaces and walkways where crowds gather and Plaintiff would like to distribute

Bibles.  Based on the record before the Court at this preliminary stage, it is

unclear if these performers are officially invited or sanctioned by Twin Cities

Pride or if they are simply members of the public expressing themselves through

their movement (or lack thereof).  Though they do not distribute anything, it is at

least arguable that these street performers may cause some amount of crowd

congestion.

Though there may be some degree of under-inclusiveness in the material

distribution regulation, the Court at this stage concludes that it is not so under-

inclusive as to be unconstitutional.  This case is distinguishable from Saieg v.

City of Dearborn, 641 F.3d 737, 737 (6th Cir. 2011), in which the Sixth Circuit

concluded that activities which the government allowed on city sidewalks

"erode[d] the significance of the government's interest in restricting leafleting on

those same sidewalks."  In Saieg, the Court noted that the government allowed

"sidewalk venders on the sidewalks . . . belying the significance of their interest

in clear sidewalks and crowd control."  Id.  There seems little doubt that street

venders cause as much, if not more, disruption as leafleteers.  Here no equivalent

disruptive activity appears to be permitted by MPRB.  While street performers

may cause some congestion, they are unlikely to cause the same type or level of

congestion as an individual or group distributing free materials to Festival

attendees.

A regulation "may still be narrowly tailored where the underinclusivity

does not favor a particular viewpoint or undermine the rationale given for the

regulation."  Bowman, 444 F.3d at 983.  Here, the alleged under-inclusivity

identified by Plaintiff is based on differing treatment of manners or mediums of

speech which neither favors nor disadvantages any particular viewpoint.  The

analysis might be different if Festival exhibitors were held to a different standard

than Plaintiff or other exhibitors, but that is not the case.  The material

distribution regulation applies equally to those who support Twin Cities Pride's

mission and those who do not.

At base, Plaintiff's proposed all or nothing approach turns the required

narrow tailoring analysis on its head.  In the context of the facts presented by this

case, the invalidation of a regulation because it does not reach all potentially

disruptive mediums of expression would force the government into an untenable

position.  The MPRB's actions would be <u>more</u> suspect, not less, if MPRB sought

to regulate the multitude of activities highlighted by Plaintiff in his under-

inclusivity analysis.  Such regulations would almost certainly be far too broad to

pass constitutional muster and would also undermine Twin Cities Pride's ability

to hold the type of Festival to which it is entitled under the First Amendment.

For the above reasons, the Court concludes that Plaintiff is unlikely to

show that the material distribution regulation is so under-inclusive as to call into

question the legitimacy of MPRB's interest in crowd control and public safety.

### iii.  Over-Inclusiveness

A regulation subject to intermediate scrutiny "need not be the least speech-

restrictive means of advancing the Government's interests."  <u>Turner</u>

<u>Broadcasting Sys., Inc.</u>, 512 U.S. at 662.

> Rather, the requirement of narrow tailoring is satisfied so long as the
> regulation promotes a substantial government interest that would be
> achieved less effectively absent the regulation.  Narrow tailoring in
> this context requires, in other words, that the means chosen do not
> burden substantially more speech than is necessary to further the
> government's legitimate interests.

<u>Id.</u> (alterations, citations, and quotations omitted).

Plaintiff contends that the material distribution regulation amounts to an

"all-encompassing ban on a particular medium."  (Pl.'s Mem. at 12.)   Plaintiff

cites to cases involving total bans on expressive conduct in a particular area.  In

Lederman v. United States, 291 F.3d 36 (D.C. Cir. 2002), for example, the Court

invalidated a perpetual "no-demonstration zone" on a public sidewalk.  The

regulation at issue there prohibited a wide range of expressive activities—

including "[p]arading, picketing, leafleting, holding vigils, sit-ins, or other

expressive conduct or speechmaking that conveys a message supporting or

opposing a point of view and has the intent, effect or propensity to attract a

crowd or onlookers."  Id. at 39.

The material distribution regulation in question here is far more limited

than a perpetual and total ban on expressive activity.  To begin, the regulation is

limited to only one form of expressive activity—distribution of material.   All

other protected expressive activities are permitted.  The regulation is also limited

in terms of time; it persists only during the two days of the Festival.  The

regulation is further limited in terms of place, applying only to certain areas

within the boundaries of Loring Park.  The MPRB booths provide an outlet for

the distribution of any material—regardless of viewpoint—in Loring Park during

the Festival.  MPRB booths are located in an area contiguous on two sides with

the Festival, with no physical boundaries separating it from the Festival.

Materials may also be distributed by placing them in the designated drop zone within the Festival.

Although Plaintiff characterizes the MPRB Area as "small," it appears to occupy nearly one fifth of Loring Park's land area.  (Belstler Decl. ¶ 13.)  During the Festival, Loring Park resembles the fairground at issue in Heffron.  The booths in the MPRB Area "are not secreted away in some nonaccessible location, but are located within the area of the [park] where visitors are expected . . . to pass."  Heffron, 452 U.S. at 655 n.16; compare Kuba, 387 F.3d at 862 (concluding that relegation of expressive activity to "small, fairly peripheral areas" did not "'sufficiently match' the stated interest of preventing congestion").  A booth in the MPRB Area is in no less attractive a location than one in the designated Festival area.  In some cases, the MPRB Area may offer even better foot traffic and visibility.  For all of these reasons it is hard to characterize the material distribution regulation as an all-encompassing ban on even a single medium of expression.

Instead, the evidence before the Court indicates that the regulation is narrowly tailored to prevent a particular manner of expression from creating

undue crowd congestion by requiring that such expression be conducted from a stationary location.

### iv.   Ample Alternative Channels of Communication

The final question under intermediate scrutiny, closely related to narrow tailoring, is whether the material distribution regulation provides ample alternative channels of communication.  The Eighth Circuit has indicated that this analysis requires the Court to determine whether Plaintiff is afforded an opportunity to "direct [his] intended message at [his] intended recipients." Nixon, 545 F.3d at 694-95.  In this case, Plaintiff's intended audience is Festival attendees.

As a result of the narrow scope of the regulation, Plaintiff has many opportunities to spread his message to Festival attendees.  At issue here is not blanket prohibition on speech, it is a regulation of the time and places that one particular manner of speech may be exercised.  Apart from the requirement that materials be distributed from a booth, Plaintiff is free to engage in all other forms of non-disruptive expressive activity throughout Loring Park.  He is free to wear clothing expressing his beliefs, to hold signs, to approach attendees and converse with those willing to engage with him, and to direct attendees to areas where they may receive a free Bible should they desire one.

Plaintiff's ability to distribute Bibles is limited but far from completely curtailed; he may leave materials in the material drop zone within the Festival and may also hand-distribute materials within Loring Park from an MPRB-Area booth.  As the Court has already noted, the designated MPRB Area, near the corner of Lyndale Avenue and Oak Grove Street, is in a well-traveled area, close to a bus stop and a park entrance.  Many Festival attendees pass through that area of Loring Park.  It is not physically removed or separated from the Festival, and it offers access to Festival attendees that is equivalent to or better than many areas within the designated Festival area itself.  Plaintiff is also free to engage in his expressive activities on the public ways in the vicinity of Loring Park, through which attendees must pass in order to reach the Festival.

In sum, the material distribution regulation provides Plaintiff with ample alternative channels of communication to present his message to his intended audience.

IV.   **Conclusion**

As was the case in <u>Pride I</u>, this case presents the "challenge of attempting to reconcile Twin Cities Pride's and [Plaintiff's] competing First Amendment rights."  721 F. Supp. 2d at 870.  In response to the Court's rulings in <u>Pride I</u>,

MPRB and Twin Cities Pride negotiated a plan which provides fewer restrictions on Plaintiff's activities than those sought by Twin Cities Pride and expands Plaintiff's opportunities to spread his message to Festival attendees.  Regardless of the content of their speech, all individuals and groups who wish to distribute materials in Loring Park during the Festival may do so from a booth.  No other expressive activity is regulated.  The space available for Plaintiff and others who do not support Twin Cities Pride's message is not separated or removed from the Festival in any way.  The demarcation of an "MPRB Area" within the park simply allows Twin Cities Pride to avoid validating a viewpoint which, under the First Amendment, it is not required to endorse.  All other protected expressive activity is preserved throughout the park during the Festival.

Based on the evidence presently before it, the Court concludes that the material distribution regulation is a content neutral time, place, and manner restriction which is narrowly tailored to serve a significant government interest and which provides ample alternative channels of communication.  As a result, Plaintiff is unlikely to succeed on his claim that the regulation is unconstitutional.  Because Plaintiff has not succeeded in showing a likely constitutional violation, the Court further concludes that the risk of harm to

Plaintiff is minimal and that the balance of the equities and the public interest

both favor MPRB.

Accordingly, based on the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Plaintiff Brian Johnson's Motion for Preliminary

Injunction [Docket No. 5] is **DENIED**.


Dated:   June 11, 2012                    s/ Michael J. Davis
                                          Michael J. Davis
                                          Chief Judge
                                          United States District Court